· Ex parte SLAUSON.

(Circuit Court, E. D. Virginia. April 18, 1896.)

INTERSTATE EXTRADITION—IMPROVIDENT ISSUE OF REQUISITION.

One S., who had been engaged with G. in the insurance business, in Tennessee, was found, on a settlement of their accounts, to be indebted to G., in about the sum of $1,800, for various sums advanced to him and his family by G., and expenses paid by G. for his account. After bringing the business to an end, and making some efforts to raise money for its further prosecution, S. returned, with his family, to his home in Virginia. G. assigned his claim against S. to one C., who caused a civil suit to be brought upon it in Virginia against S. He also endeavored, by persuasions and threats, to induce S. to return to Tennessee, for what purpose did not appear. S. having refused to return, C. procured from the governor of Tennessee, upon affidavits, a requisition for S., as a fugitive from justice, alleging that he was guilty of "fraudu-

lent appropriation of money," and caused S. to be arrested thereunder in Virginia, for removal to Tennessee. *Held,* that no crime had been committed or was charged, that the requisition was improvidently issued, and S. should be discharged on habeas corpus.

Lassiter & Lassiter, for petitioner.
R. Carter Scott, for respondent.

HUGHES, District Judge. On the 23d ult. the governor of Tennessee made requisition upon the governor of Virginia for the extradition from this state to Tennessee of George W. Slauson, a citizen of Petersburg, Va., alleging in the requisition that Slauson stands charged in that state with the crime of "fraudulent appropriation of money," and that he is a fugitive from justice. The governor of Virginia, complying with this requisition, and reciting that it was accompanied by affidavits duly made, issued a warrant on the 14th inst., directed to the sergeant of Petersburg, requiring him to arrest and secure Slauson, afford him opportunity to sue out a writ of habeas corpus, and thereafter to deliver him to the custody of one Snapp, to be taken back to the state of Tennessee, "from which he fled." Slauson was arrested by the sergeant and turned over to Snapp, who committed him temporarily, overnight, to the jail in Petersburg. From the jail there he sent his petition to me praying for the writ of habeas corpus. This was granted, as of course, and Slauson is before me in pursuance of it.

The writ of habeas corpus is extolled by Blackstone as another Magna Charta of civil liberty. It is the most celebrated writ of English-speaking peoples. It is the process provided by law for deliverance from illegal confinement. The writ has no respect for persons. It lends itself to the humblest human being, and questions and inquires into the actions of the most exalted persons in the community and most powerful officers of government.

In regard to extradition, this writ is indicated by the law itself as the special remedy available to the citizen against the misuse and abuse of that proceeding. Requisitions for persons stigmatized as fugitives from justice, when issued, as in the case at bar, on mere ex parte affidavit, and not founded upon indictment, are liable to abuse. Little care can be taken to obtain the real facts of the case by the officers issuing a requisition. Papers are prepared and the demand issued, often in the most perfunctory manner; and it is impracticable for the governor, to whom the requisition is addressed, to inquire into the merits of the proceeding. But requisitions based upon affidavit are issued only in sudden emergencies, rarely after as much as four months of deliberation. The laws provide for no hearing to the alleged fugitive before the executives of the two states, and seem to recognize the fact that he has no redress except in this writ of high privilege,—this writ of habeas corpus.

Slauson is here clothed by law with the right to show why he should not be taken away from his wife and children and his home in Petersburg, to the distant state of Tennessee, and there tried on the vague charge, upon merely individual affidavit, of "fraudulent

appropriation of money." He has a right to show here that he has not committed the crime of a "fraudulent appropriation of money," and he has a right to show, moreover, the animus of the person who has instituted this proceeding. This writ would be a mockery in the case at bar if it were not competent for me to inquire whether the governor of Tennessee has been imposed upon by false affidavits. Slauson shows that his indebtedness in Tennessee is a balance of $1,328.69, which is the result of dealings with Gerald M. Funnell during the year 1895, under contract mutually agreed upon, and recognized by both. Their business was not successful, and towards the close of the year it was found that Slauson would have to leave Tennessee and come to the East to recuperate his finances. This recourse was talked over and agreed upon between Slauson and Cecil G. Funnell, the person who is now prosecuting him. Slauson and Gerald M. Funnell had been engaged in the business of soliciting insurances. The plan was, that Slauson, on coming East, was first to go to Baltimore to consult there with Mr. Breezée, a well-known and very prominent man in the business of insurance, and that Slauson's after movements should be governed by the result of his visit to Baltimore. Cecil G. Funnell not only advised and counseled Slauson to come to the East from Tennessee, but gave him pecuniary aid for making his visit to Baltimore.

As to the pecuniary debt left by Slauson in Tennessee, it was made up of items set out in a bill of particulars filed by C. G. Funnell, in a suit instituted by him against Slauson in the hustings court of Petersburg, on the 10th of March just past. The notice or declaration in the case claims the balance already mentioned, "as due to me by you on contract as follows: (1) For money due under contract made in duplicate between you and Gerald M. Funnell, dated July 25, 1895, * * * said Gerald M. Funnell having duly assigned to me all of his rights and claims thereunder. (2) For money had and received by you for my use. (3) For money advanced you and your wife, at your request. (4) For money paid, laid out, and expended for you, at your request. All of which indebtedness is fully shown in the statement of my account against you, hereto attached, * * * which amount of money is justly due to me on contract, as aforesaid,"—meaning Slauson's contract with Gerald M. Funnell.

The account filed opens with a debit balance of between $400 and $500, and embraces credits near its close of nearly the same amount, so that the items set out in the account make up the amount of the existing indebtedness of Slauson to C. G. Funnell,—an indebtedness which C. G. Funnell purchased from G. W. Funnell. I will set out some of the items which make up this $1,300 of indebtedness:

1895.

2. Aug. 27. Cash credited H. B. Maupin, as per request and notification of this date........................................................ $42.00

3. Sept. 12. Cash handed Mrs. Slauson at Greeneville................. 1.00

4. Sept. 16. Cash at Greeneville, just prior to G W. S.'s trip to Knoxville ............................................................ 15.00

24. Oct. 28. Livery charged C. G. F., as per order given G. W. S. to hand Hall & Hall.............................. ... .................... 15.25

36. Oct. 28. Cash ($55) and check ($55) at Greeneville, prior to leaving for Pulaski ..................................................... 110.00

24a. Nov. 1. Draft to order G. W. S. sent to Columbia, from Greeneville, ...................................................................... 30.00

25. Nov. 1. Cash to Mrs. Slauson at Greeneville..................... 5.00

26. Nov. 2. Cash to Mrs. Slauson at Greeneville ................... 3.00

27. Nov. 2. Cash to Mrs. Slauson at Greeneville..................... 5.00

28. Nov. 4. Cash to Mrs. Slauson at Greeneville..................... 5.00

29. Nov. 5. Hotel bill at Greeneville for family, paid by C. G. F., according to arrangement prior to G. W. S.'s departure for Pulaski... 15.00

30. Nov. 5. Railroad fares for family, paid by C. G. F., according to arrangement prior to G. W. S.'s departure for Pulaski........... 18.42

31. Nov. 5. Cash handed Mrs. Slauson while en route Greeneville to Columbia ................................................................ 10.00

32. Nov. 5. Pullman fares and baggage charges while en route Greeneville to Columbia............................................. 3.50

33. Nov. 9. Draft to Columbia from Memphis........................ 30.00

38. Nov. 18. Check from C. G. F. while at Columbia................. 39.00

40. Nov. 18. Check to H. E. Jones to take up G. A. Blackmore's note (application written by G. W. S. and postponed). Subsequently H. E. Jones' check sent G. W. S., refunding $18.80.................... 125.25

## Section 5445 of the Code of Tennessee provides as follows:

"If a contract of loan for use, or of letting and hiring, or other bailment or agency, be used merely as the means of procuring possession of property, with an intent to make a fraudulent appropriation at the time, it is larceny."

The items set out in the foregoing list are given merely to show the character of the indebtedness. All the debit items are of the same character. It would be an insult to the intelligence of the inspector of these items to enter into an argument to show that neither the items nor the aggregate which they constitute could be regarded as evidences of money "fraudulently appropriated," within the meaning of the Tennessee law. Here are two men engaged in the business of insurance,—one of them as a traveling solicitor of insurance; the other keeping their office, collecting and managing their earnings, under an express contract, and defraying the traveling and family expenses of the traveling associate in business. These dealings run on for a year, and there is a settlement in December, and a balance ascertained due from Slauson to Gerald M. Funnell. There is no misunderstanding at the time of this settlement between Slauson and Gerald M. Funnell. There is no pretense or charge of fraud at the time. It is not shown that Gerald M. Funnell, with whom the business was done, ever believed or charged fraud against Slauson. But Cecil G. Funnell bought the debt held by Gerald M. Funnell against Slauson. He did not charge fraud for a series of months. He sued for the debt, as due by contract, as late as March 10th, just passed. He sent his claim to Petersburg, where Slauson lived and kept house with his family, ordering suit to be brought upon it, as due on a contract.

It seems that, for some reason not proper or necessary to be exposed in public court, Cecil G. Funnell was very anxious for Slauson to return with his family to Tennessee. His eagerness for this return began to manifest itself in the latter part of December, 1895,

apparently before he purchased the debt against Slauson from Gerald M. Funnell. Persuasions failing to bring about Slauson's return to Tennessee, resort was soon had to threats. He first threatened to publish, and then published, circulars assailing the character of Slauson, and mailed them to insurance men and others. He threatened other attacks upon Slauson, the character of which was not made known to Slauson. He talked to Slauson's wife, and rehearsed his threats to her. He did this on one occasion on a railroad train, and did it so effectually that the woman, in alarm, wrote to her husband a letter, from which the following extracts are made:

"On Train.

"* .* * Cecil arrived in Chattanooga last night at 11. He has told me of all the awful things that he could do to you. He will write to papa, to the bank at ——— [illegible], and, in fact, to every one. He will have it advertised that you did God knows what. He said that he could take our trunks, but for our sakes he don't want to do that; but, if I go on to you before you and he come to some understanding. he will make it dreadful for all. He said you have his railroad ticket. Have you? He said he gave you money to go to Baltimore on, and back, if you did not succeed in arranging things." etc.

Nothing availed to bring back Slauson and his family to Tennessee,—neither persuasion nor threats. After purchasing the debt due from Slauson to Gerald M. Funnell, and after bringing suit upon the debt, as due upon a contract, as late as the 10th of March just passed, he then resorted to the extradition proceedings which have been brought before me for consideration, the foundation of which is Cecil G. Funnell's affidavit charging the crime of a "fraudulent appropriation" of money.

Comment upon his conduct is unnecessary. His charge of fraud against . Slauson is an afterthought. The affidavit by which he charged the fraud is a flagrant perjury. His prosecution of this extradition proceeding is malicious. The governor of Tennessee was . deceived, and the requisition which he issued for Slauson was improvidently granted. The governor of Virginia was not advised of, and had no means of testing the truth of, the allegations of the requisition; but, in performing his duty in issuing his warrant directing the arrest of Slauson, he took care to reserve to him in advance the privilege of the writ of habeas corpus, under which he is now before me.

I have thus dealt with the facts in the case. The prisoner ought to be discharged on technical grounds also. The law in such proceedings requires that the charge shall be substantially set forth in the papers filed. In these papers there is no crime substantially set forth. There is merely a reference to a criminal statute, itself not identified by the reference. Merely to refer to a class of criminal acts is not to charge a specific crime. This is all that has been done in this affidavit. Nor does the affidavit set out important elements of this statutory offense. The warrant is vague, and does not inform the prisoner of the character of the crime, nor the time, place, or circumstance of its commission, of which every prisoner is entitled to be advised.

George W. Slauson must be discharged from custody.